IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
MISSOURI - SOUTHEASTERN DIVISION

| | |
|---|---|
| Joanie White-Wagoner<br><br>Plaintiff,<br><br>v.<br><br>Pemiscot County Memorial Hospital d/b/a Pemiscot Memorial Health Systems, Pemiscot County<br><br>Defendants | Civil Action No:  _____<br><br><br><br>COMPLAINT<br>JURY TRIAL DEMANDED |

Plaintiff Joanie White-Wagoner ("Plaintiff" or "Mrs. White-Wagoner"), by and through her counsel, complains against Defendant Pemiscot County Memorial Hospital d/b/a Pemiscot Memorial Health Systems ("Defendant PMHS" or "PMHS") and Pemiscot County ("Defendant Pemiscot" or "County") as follows:

PARTIES

1.      Plaintiff is a 47-year-old, female who is a citizen of Florida with her principal place of residence located at 10143 SE 122nd Lane Belleview, FL 34420.

2.      Defendant PMHS is a healthcare provider that has a principal place of business located at 946 E. Reed St. Hayti, Missouri 63851.   Defendant PMHS is owned by Pemiscot County, Missouri.

1

3.      Defendant Pemiscot County is a county located in the southeastern corner of Missouri at 610 Ward Avenue Caruthersville, MO 63830.   Defendant Pemiscot County owns Defendant PMHS.

## JURISDICTION AND VENUE

4.      This Court has original subject matter jurisdiction under 28 U.S.C. § 1331 as this matter  involves federal questions pursuant to Title VII of the Civil Rights Act of  1964, 42 U.S.C. § 2000e et seq. ("Title VII"); the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. ("ADA"); the Fair Labor Standards Act, 29 U.S. Code § 201 ("FLSA"); The Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621; The Equal Pay Act  29 U.S.C. §206(d) ("EPA"); 41 U.S.C. § 4712(a)(1) - Enhancement of contractor protection from reprisal for disclosure of certain information; and 41 USC § 4705 - Protection of contractor employees from reprisal for disclosure of certain information.   Under Article III of the United States Constitution, this Court has jurisdiction over Plaintiff's Missouri common law and statutory claims pursuant to 28 U.S.C. § 1367.  Venue is proper in this District under 28 U.S.C. § 1391 because Defendants are subject to personal jurisdiction in this District and because a substantial part of the events or omissions giving rise to this claim occurred in this District.

5.      Additionally, and/or alternatively, this Court has diversity jurisdiction under 28 U.S.C. § 1332, as Plaintiff and Defendants are residents of different states and the amount in controversy exceeds $75,000.00.

## EXHAUSTION OF ADMINITRATIVE REMEDIES

6.      Plaintiff filed a Charge of Discrimination ("Charge") **EXHIBIT A** with the Equal Employment Opportunity Commission ("EEOC") on or about January 26, 2024, against

2

Defendant PMHS.  Plaintiff received a Right to Sue Letter on or about June 27, 2024.  **EXHIBIT B**  Plaintiff's Charge was cross-filed with the Missouri Commission on Human Rights.  Therefore, Plaintiff has exhausted her administrative remedies regarding Defendant PMHS.

7. Plaintiff filed a Charge **EXHIBIT C** with the EEOC on or about August 16, 2024, against Defendant Pemiscot County.   Because Defendant Pemiscot County is a public entity, the EEOC transferred Plaintiff's Charge to the Department of Justice.   Plaintiff received a Right to Sue Letter from the Department of Justice on or about August 22, 2024.  **EXHIBIT D**   Plaintiff's Charge was cross-filed with the Missouri Commission on Human Rights.  Therefore, Plaintiff has exhausted her administrative remedies regarding Defendant Pemiscot County.

<u>FACTUAL ALLEGATIONS</u>

*Plaintiff's Qualifications and Employment History*

8. Plaintiff is a 47-year-old woman who has almost three (3) decades of healthcare experience.

9. Plaintiff's interest in healthcare started in 1997 when she worked for the Department of Defense treating Active Duty, dependents and military retirees residing in or around Livorno, Italy.  In 1999, Plaintiff joined the United States Air Force and was assigned for technical training at Shephard AFB – Wichita Falls Texas Medical Services Administration. Plaintiff initially was stationed at Andrew AFB – Malcolm Grown Medical Center – Maryland where she embraced various medical administrative duties.  After attaining the rank of Senior Airman, Plaintiff was Honorably Discharged from the United States Air Force in 2003.

10. In addition to gaining professional experience, Plaintiff received a B.S. in Healthcare Administration from Southern Illinois University – Carbondale in 2007 and Master of

3

Health Administration and a Master of Business Administration from the University of Maryland in 2010 and 2011, respectively.  Armed with years of experience and the necessary educational background, Plaintiff accepted the role as Health System Specialists (a healthcare executive role) at the Dublin VA Medical Center.  Plaintiff was accepted into VA's Executive Leadership Program in 2011 and was selected as Interim Chief Operating Officer for Carl Vinson VA Medical Center that same year.  In this role, Plaintiff oversaw a program budget of over $500M and a financial turnaround of approximately $9M that included completion of successful construction projects and operational development.

11.     After her husband's last military relocation in 2014, the Plaintiff took on a contract position with The Hashmi Group, specializing in acquiring rural hospitals in Texas. The Plaintiff led the expansion of the main hospital from 45 beds to 145 beds and oversaw the acquisition of two additional hospitals, all achieved within a year.

12.     In 2015, the Plaintiff assumed the role of CEO at Baptist Health in Conway, Arkansas. Under her leadership, Baptist Health successfully developed a 111-bed hospital from scratch.  Plaintiff was accountable for recruiting the executive team, staff, and physicians while also dedicating herself to establishing small rural clinics for financially vulnerable citizens in Conway area.  Plaintiff's professional career was disrupted when she was diagnosed with Graves' Disease in 2017, leading her to take a leave of absence to establish a long-term plan for managing this incurable lifelong disability.

13.     In 2018, after learning various medical strategies to mitigate Graves' Disease, Plaintiff was recruited to assist Quorum Health ("Quorum") with a divesture of two of their Pennsylvania rural hospitals.  After this short temporary role, Plaintiff was then asked by Quorum

to lead a financial turnaround and possible divesture of one of their rural hospitals located in Eastern North Carolina Later that same year, Plaintiff accepted the role of CEO at Martin General Hospital which is a county owned rural hospital that Quorum Health – a spin-off of Community Health Systems ("CHS").  Upon her arrival, Plaintiff had been the fifth permanent CEO in nearly as many years and she was tasked with turning around the hospital's finances to attract a potential buyer.  Unfortunately, in 2018, the hospital faced ongoing financial challenges, leading to the merging of the Plaintiff's CEO position with the CFO role. Although there was an opportunity to relocate with Quorum Health, the Plaintiff chose to pursue different professional goals.

14.    In 2021, after being recruited by LifePoint Health, Plaintiff accepted the position of CEO of Lourdes Health - Critical Access Hospital ("LifePoint") located in Pasco, Washington. In this role, Plaintiff not only facilitated the final integration phase of Lifepoint's acquisition from Ascension but she led a robust and successful physician recruitment campaign as well as a market growth strategy.  Later in 2021, Plaintiff left this role and re-energized her consulting business that assisted hospitals and healthcare organizations in rural communities develop financial turnaround strategies.

*Plaintiff Hired as PMHS' CEO*

14.  Plaintiff carried on with her consulting business until July 2023, at which time she was recruited by Warbird Consulting Services, Inc. for the CEO position at PMHS.  After an extensive interview process, Plaintiff was accepted this position and replaced Douglas Johnson – PMHS' Interim CEO.

15.  Before Plaintiff became the CEO, there were multiple male CEOs, including both interim and permanent ones, in a short period. The previous permanent CEO of PMHS, Sunil

Gungee, was terminated about one year before Plaintiff's hiring.  Plaintiff and Mr. Gungee worked in the same office (PMHS headquarters), under similar working conditions, reporting to the PMHS Board of Directors, and at the same level as CEO.   Both Plaintiff and Mr. Gungee were required to perform equal work with the same level of skill, effort, and responsibility in the CEO position at PMHS.   Even though Plaintiff was more qualified than Mr. Gungee, Mr. Gungee's total compensation was more than Plaintiff's total compensation.  For example, Mr. Gungee received additional benefits not offered to Plaintiff such as a housing allowance, a car stipend, life insurance premium payments, and access to a retirement plan.

16.    Plaintiff signed an Employment Agreement ("the Agreement") with PMHS on or about July 27, 2023. **EXHIBIT E**  The Agreement – which memorialized several Plaintiff's duties and other terms of her employment  – had a commencement date of September 18, 2023, however, Plaintiff's date of pay was changed to September 5, 2023, because she had been assisting Mr. Johnson on a variety of operational matters.  Before her official start date, Plaintiff began conducting an overall assessment of PMHS' financial operations and soon realized that PMHS was in dire financial and compliance shape.  Plaintiff essentially walked into an administrative mess as PMHS was teetering on the verge of bankruptcy thanks to years of poor management.  Plaintiff immediately took the necessary actions to correct PMHS' compliance shortcomings and assist with PMHS' financial situation.  Plaintiff approached her new role with enthusiasm and proved to be a dedicated team player, fully committed to meeting the various business objectives of her position.

17.    During Plaintiff's tenure, she worked tirelessly to bring PMHS into financial solvency and correct PMHS' compliance, operational and quality of care challenges.  Plaintiff was

6

laser-focused on bringing PMHS into compliance with CMS, Office of Rural Health, Missouri Medicaid, Department of Labor, and Department of Health. Additionally, Plaintiff actively looked for extra funding sources for PMHS, exploring bridge loan lenders and financial grants. These funds were necessary due to PMHS's financial situation in operational, IT, billing, and management areas.

*Plaintiff reported numerous violations to the PMHS Board of Directors and various state and federal agencies.*

18. Plaintiff unearthed several potential statutory and regulatory violations during her tenure with PMHS. As a certified healthcare professional, Plaintiff recognized her legal and ethical duty to report these violations to the appropriate administrative agencies and inform the PMHS Board of Directors.

19. On or about September 18, 2024, during Plaintiff's first week of onsite employment, Plaintiff received notification that PMHS was undergoing a Rural Health Clinic ("RHC") billing audit related to PMHS' RHC billing (49/51 rule) compliance. Plaintiff reviewed PMHS' billing reports and discovered potential compliance issues especially related Medicare and Medicaid reimbursement for PMHS' pain management services. Plaintiff informed Johnna Green, who was then the PMHS Board Treasurer, about these concerns and subsequently brought them to the attention of the PMHS Board of Directors around September 23, 2023. From September 2023 through January 2024, Plaintiff updated the PMHS Board of Director about these concerns with her last notification occurring on or about January 15, 2024. On or about September 23, 2023, and again in December 2023, Plaintiff reported these issues and provided follow-up information to the Missouri Attorney General's Office's Medicaid Fraud Control Unit.

7

20.     On a separate occasion, on or about October 1, 2023, Ms. White-Wagoner found that PMHS may have accidentally violated Missouri Medicaid and CMS billing requirements by charging patients for physician visits when they were seen by a nurse practitioner. Moreover, Plaintiff was also concerned that some physicians apparently were getting paid without having a contract with PMHS.  Plaintiff raised these concerns with the PMHS Board of Directors and representatives of the PMHS Board of Directors at various points.  From September 2023 through January 2024, Plaintiff updated the PMHS Board of Directors about these concerns with her last notification occurring on or about January 15, 2024.  On or about November 20, 2023, and a follow up notification on or about December 10, 2023, Plaintiff reported these issues to CMS, Missouri Attorney General's Office's Medicaid Fraud Control Unit.

21.     On yet another occasion, on or about October 9, 2023, Plaintiff found that PMHS may have violated DOL wage and hour regulations by improperly classifying some employees as exempt. Plaintiff discovered noticed that PMHS' HR Department allowed employees to stay on payroll after using up their FMLA entitlement, potentially to maintain their full-time status for health insurance.  On or about October 10, 2023, Plaintiff informed PMHS' Board Chair about her concerns.  The potential DOL violations were so egregious that Plaintiff terminated PMHS' Director of HR.

22.     On yet another occasion, Plaintiff self-reported to the DOL potential wage violations – including but not limited to – failing to pay overtime and not allowing employees to leave the premises for lunch and meal breaks.  At various times during December 2023, Plaintiff participated in a DOL process that investigated these issues.  On or about December 20, 2023, and again on January 15, 2024, Plaintiff updated the PMHS Board of Directors about the DOL's investigation and other related developments.  Instead of requesting further information from the

8

Plaintiff, the PMHS Board promptly excused the Plaintiff from the December 20, 2023 meeting to hold a "closed meeting" away from public view.

23.     On November 3, 2023, Plaintiff discovered that PMHS may not have complied with the terms of a USDA grant.  On or about November 5, 2023, Plaintiff realized that PMHS received at least one (1) USDA grant that may have not been used for the grant's intended purpose.  Specifically, Plaintiff discovered that USDA grant funding, meant for purchasing MRIs, may have been redirected to an unrelated company.  Additionally, it was found that USDA grant funds might have been used to buy two (2) ambulances, which were then sold without notifying the USDA of this transaction.  On or about November 20, 2023, Plaintiff notified the PMHS Former Board Chair Lance Crawford and former Treasurer and Current Board Chair Johnna Green about these potential violations.  When Plaintiff stated that she would need to report what she found to USDA, Ms. Green balked and recommended Plaintiff take a different approach.  Plaintiff ultimately reported her concerns to the USDA Office of OIG on or about December 1, 2023.

24.     Plaintiff assumed the PMHS Board of Directors would embrace Plaintiff's efforts to bring PMHS into compliance, but the opposite occurred as the PMHS Board of Directors treated each of Plaintiff's actions with combativeness, hostility, and threats.

*Plaintiff's Employment Agreement*

25.      As noted above, Plaintiff and PMHS executed the Agreement in September 2023.  Plaintiff was 46 years old at the time she signed the Agreement.  The Agreement guaranteed Plaintiff an annual salary of $260,000 through August 31, 2026, and only permitted PMHS to terminate Plaintiff's employment "for cause" via a written Notice of Termination.     The

9

Agreement stated, in part: "'Date of Termination' shall mean: (1) if this Agreement is terminated for reasons other than cause, 30 days after Notice of Termination is provided or (2) if her employment is terminated for cause as defined herein, the date on which Notice of Termination is provided to Employee.  Any termination by the Hospital pursuant to Paragraph 6 (Termination) above shall be communicated by written Notice of Termination to the Employee."

26.    As of the date of this filing, PMHS has not issued Plaintiff a written Notice of Termination as required by the Agreement. Instead, Plaintiff was dismissed on or around January 19, 2024, through an abusive phone call from Mr. Crawford.

27.    Despite not working for PMHS for months, Plaintiff continues to receive her salary. PMHS isn't paying Plaintiff's salary out of the kindness of its heart especially given PMHS' dire financial condition and the legal fees charged by PMHS' prestigious outside counsel.  It appears that PMHS may be using the Agreement's "release" of claims clause to avoid paying Plaintiff as required until August 31, 2026.

28.    Unfortunately for PMHS, the Agreement's "release" of claims clause is unenforceable.  First and foremost, the Agreement's "release" of claims clause does not comply with the Older Workers Benefit Protection Act ("OWBPA") by failing to provide Plaintiff 21 days to review any waiver language, failing to advise Plaintiff to seek counsel, and failing to expressly memorialize that Plaintiff would be waiving her rights under the ADEA.  See Parsons, 447 F.3d at 1104 (citing Oubre, 522 U.S. at 427  - "Congress delineated [the Older Workers Benefit Protection Act] with precision and without qualification: An employee 'may not waive' an ADEA claim unless the employer complies with the statute.").  Therefore, the Agreement's "release" of claims clause is invalid by operation of law as Plaintiff was 46 years old at the time she signed it. Second, Plaintiff – through counsel – manifested her intention not to be bound by the Agreement's

10

invalid "release" of claims clause.   Counsel for Plaintiff clearly articulated this position via an

email to Shawn Hanschen, Esq. – counsel for PMHS and Defendant County – in February 2024.

The email from counsel for Plaintiff to Mr. Hanschen stated, in part:

> "If this most recent disbursement was intended by your client to trigger the provisions of Paragraph 9, the funds will be returned forthwith as my client does not accept any so-called release of future claims at this juncture.  Additionally, please direct any and all future communications and disbursements to Dufresne Law Firm so that moving forward any funds intended for my client are held in trust until the terms of acceptance are clear and are approved by both parties.  PMHS has not provided Ms. White-Wagoner a written Notice of Termination.  A written Notice of Termination triggers the 'Date of Termination.' Therefore, because PMHS has not issued a written Notice of Termination, the Agreement remains enforceable meaning PMHS is obligated to pay Ms. White-Wagoner her salary and benefits until she receives a written Notice of Termination."

Several weeks later, Plaintiff's counsel reiterated this position via an email to PMHS' newly

retained counsel Jay Morris and Jacqueline M. Duvall.

29.     On multiple occasions, Plaintiff has offered to return to PMHS the salary payments

she received since her termination.   Moreover, Plaintiff has not spent any of these funds and they

remain in trust with Dufresne Law Firm, PLLC.  Plaintiff has been more than willing to tender-

back any of these payments, but such attempts have been ignored by PMHS.

30.     PMHS' conduct illustrates an express and clear repudiation of PMHS' contractual

obligation to pay Plaintiff through the contract end date of August 31, 2026.   PMHS conduct –

both through PMHS counsel and otherwise – represents a definite and unconditional intention

not to perform PMHS' contractual duty under the Agreement.

31.     Ultimately, PMHS hired David Ketchum to replace Plaintiff.  Mr. Ketchum is a

male who assumed the same CEO duties previous performed by Plaintiff.  Mr. Ketchem's total

compensation is more than Plaintiff's total compensation even though he is less qualified than

Plaintiff.  Plaintiff has nearly three (3) decades of professional experience in healthcare administration while Mr. Ketchum had never performed any hospital administrative roles prior to his ascension to PMHS' CEO.  Based on information and belief, Mr. Ketchum is substantially younger than Plaintiff.

*Plaintiff's accomplishments as CEO even as she struggled with Graves' disease.*

32.     Plaintiff was qualified for the CEO position as evidenced by her exceptional performance.  In many instances, Plaintiff exceeded her job expectations as illustrated by this short list of accomplishments during her tenure as PMHS' CEO:

- Significant cost containment initiatives implemented such as: eliminated overstaffing due to decreased volumes of that of past years, reduction of overtime, reduction of food costs by implementing GPO contracted food vendor.

- Recruitment of two (2) part time physicians to replace deceased physician and processes to begin to recruit a replacement physician for Hayti Primary Care.

- Development of growth and cost reduction strategies with contracted pain provider.

- Negotiations with vendors who were not being paid and threatening termination of services.

- Launching of application processes for several funding opportunities: USDA RD Grant/loan program, Bridge loan programs, ERAC IT and telehealth Infrastructure grant with Missouri agency, USAC telehealth health grant with UAMS.

- Robust revenue cycle process improvement initiatives to improve "clean" claims rate, reduce timely filing penalties, and decrease accounts receivable.

- Numerous tasks to bring hospital in compliance with several federal and state regulatory entities.

- Started process of appeal/arbitration of FEMA grant that had been denied due to lack of response by state.

- Successfully submitted and passed at least two (2) Department of Health inspections/complaints of hospital, kitchen and nursing home.

- Submitted application for Missouri Health Foundation for grant writing services.

- Implemented/hired a separate quality director position to spearhead quality improvement program.

This impressive list of accomplishments shows that Plaintiff met the expectations of PMHS' CEO. Plaintiff is still qualified to be PMHS' CEO and maintains an outstanding professional reputation in the healthcare industry.

33.     Upon her initial hire, Plaintiff informed PMHS of her Graves' disease, which results in Plaintiff experiencing the following symptoms: anxiety, fatigue, difficulty concentrating, memory issues, increased appetite, diarrhea, hand tremors, weight loss, hair loss, muscle weakness, and swallowing difficulties.   Unfortunately, Plaintiff's Graves' disease has led to an acute autoimmune disorder in which her immune system attacks healthy tissue in the thyroid gland, causing hyperthyroidism; this interferes with Plaintiff's daily activities including sleeping, speaking, walking, thinking and concentrating.   Despite the fact Graves' disease substantially limited one or more of Plaintiff's major life activities, Plaintiff persevered and cleared many professional milestones during her tenure as PMHS' CEO.

34.    PMHS knew about Plaintiff's disability at all relevant times during her employment. Shortly after her initial hire date, Plaintiff informed the PMHS Board of Directors that she needed to reside in Tennessee rather than Missouri because the Veterans Affairs outpatient clinic is in Dyersburg, TN and better suited to treat Graves' disease.  PMHS Board of Directors approved this request, showing they were aware of Plaintiff's serious medical condition throughout her employment.    In fact, Plaintiff's Graves' disease caused her hospitalization at PMHS and Tennessee Health on or about December 6, 2023, and December 12, 2023, respectively.  PMHS was aware Plaintiff's hospital stays were due to Graves' disease but harassed the Plaintiff during her hospital stays by imposing unreasonable work demands, including 24/7 availability, repeatedly inquiring about her full-time return to work, calling the hospital frequently to locate her, and persistently texting her.

## CLAIM FOR RELIEF

### Count I

Age Discrimination Violation – 29 U.S.C. § 621 et seq.

35.    Plaintiff realleges and incorporates herein by reference the foregoing paragraphs.

36.    At all relevant times, PMHS has been, and continues to be, an employer within the meaning of the ADEA, 29 U.S.C. § 630.  At all relevant times, PMHS has been engaged in interstate commerce within the meaning of the ADEA and has employed, and continues to employ, twenty or more employees.

37.    The ADEA makes it unlawful for employers and their agents "to fail or refuse to hire . . . any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1).

38.    Plaintiff is over 40 years old and was 46-years old at the time she signed the Agreement.

14

39.     Plaintiff met and continues to satisfy the applicable job qualifications for CEO.

40.     Plaintiff suffered an adverse employment action in that she was terminated on or about January 19, 2024.

41.     Age was a factor in PMHS' termination of Plaintiff.

42.     PMHS replaced Plaintiff with Mr. Ketchum who is substantially younger than Plaintiff.

43.     As a direct and proximate result of the foregoing violations of the ADEA, Plaintiff has sustained economic and non-economic damages, including, but not limited to, denial of the wages and other benefits, lost interest on those wages and other benefits, and loss of the opportunity to advance within PMHS. Plaintiff is entitled to recover economic and statutory damages and penalties, including back pay, front pay, liquidated damages, and other appropriate relief.

### Count II

Fair Labor Standards Act, 29 U.S. Code § 201
Discrimination

44.     Plaintiff realleges and incorporates herein by reference the foregoing paragraphs.

45.     The Fair Labor Standards Act ("FLSA") makes it unlawful "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee." 29 U.S.C. § 215(a)(3)

46.     Not only did Plaintiff alert the PMHS Board about PMHS's potential FLSA violations on or about December 20, 2023, but she also truthfully participated in a DOL

15

investigation by self-reporting PMHS' potential wage violations to the DOL on or about December 11, 2023.

47.     At the time of Plaintiff's termination, she had engaged in FLSA protected activity by reporting potential wage violations that caused the DOL to launch an investigation into PMHS' wage practices.

48.     Plaintiff suffered an adverse employment action when PMHS terminated her employment on or about January 19, 2024

49.     As a direct and proximate result of the foregoing violations of the FLSA, Plaintiff has sustained economic and non-economic damages, including, but not limited to, denial of the wages and other benefits, lost interest on those wages and other benefits, and loss of the opportunity to advance within PMHS. Plaintiff is entitled to recover economic and statutory damages and penalties, including back pay, front pay, liquidated damages, and other appropriate relief.

## Count III

Fair Labor Standards Act, 29 U.S. Code § 201
Retaliation

50.     Plaintiff realleges and incorporates herein by reference the foregoing paragraphs.

51.     Plaintiff participated in FLSA protected activity by self-reporting a complaint with the DOL on or about December 11, 2023, and by informing the PMHS Board of Directors about this issue on or about December 20, 2023, and again on or about January 15, 2024.

52.     Plaintiff was truthful in her responses to the DOL regarding PMHS's potential wage violations of FLSA.

53.     PMHS took an adverse employment action against Plaintiff after she self-reported PMHS' potential wage violations to the DOL.

54.     Plaintiff was terminated on or about January 19, 2024.

55.     There was a causal connection between Plaintiff's protected activity and PMHS' adverse employment action.

56.     As a direct and proximate result of the foregoing violations of the FLSA, Plaintiff has sustained economic and non-economic damages, including, but not limited to, denial of the wages and other benefits, lost interest on those wages and other benefits, and loss of the opportunity to advance within PMHS. Plaintiff is entitled to recover economic and statutory damages and penalties, including back pay, front pay, liquidated damages, and other appropriate relief.

### Count IV

Title VII of the Civil Rights Act, as amended, 42 U.S.C. §2000e, et seq.
Disparate Treatment – Gender

57.     Plaintiff realleges and incorporates herein by reference the foregoing paragraphs.

58.     Plaintiff is a female.

59.     Plaintiff was qualified for the PMHS' CEO position because of her prior work experience, education, and prior work performance.

60.     Nevertheless, Plaintiff was terminated from her position by PMHS.

61.     PMHS discharged Plaintiff from the PMHS CEO position because of her gender and replaced her with Mr. Ketchum who is less qualified than Plaintiff.

17

62.     Similarly situated individuals outside Plaintiff's gender – such as Mr. Ketchum – were treated more favorably in that they were permitted to retain their positions and benefits even after ignoring or failing to remedy PMHS' various regulatory violations and internal failings.

63.     As a direct and proximate result of the foregoing disparate treatment, Plaintiff has sustained economic and non-economic damages, including, but not limited to, loss of wages, benefits, interest thereupon, loss of the opportunity to advance with PMHS and emotional distress. Plaintiff is entitled to recover economic and statutory damages and penalties, including back pay, front pay, compensatory and punitive damages attorneys' fees, costs and other appropriate relief.

### Count V

American with Disabilities Act of 1990, as amended, 42 U.S.C. § 12101, et seq.
Perceived Disability Discrimination and Harassment

64.     Plaintiff realleges and incorporates herein by reference the foregoing paragraphs.

65.     Plaintiff was an employee of PMHS within the meaning of 42 U.S.C. § 12111(4).

66.     Plaintiff is a qualified individual within the meaning of 42 U.S.C. § 12111(8) in that prior to and at the time that PMHS fired Plaintiff from her position Plaintiff has the requisite education and experience to perform and can perform the essential functions of her position, and either held or desired to hold a position as PMHS' CEO.

67.     However, Plaintiff was regarded as disabled by PMHS and PMHS perceived Plaintiff as suffering from a Graves' disease (hyperthyroidism) which caused physical impairment that substantially limits Plaintiff's major life activities including sleeping, speaking, walking, thinking and concentrating.

18

68.     Plaintiff was marginalized and treated inferior to her co-workers based solely on her disability.  As a result of PMHS regarding Plaintiff as disabled, Plaintiff was caused by PMHS to be terminated from her position and subject to emotional distress.

69.     As a direct and proximate result of the foregoing violation of the ADA, Plaintiff has sustained economic and non-economic damages, including, but not limited to, loss of wages, benefits, interest thereupon, loss of the opportunity to advance with PMHS and emotional distress. Plaintiff is entitled to recover economic and statutory damages and penalties, including back pay, front pay, attorneys' fees, costs of this litigation and other appropriate relief pursuant to 42 U.S.C. § 12205. 34.  Plaintiff is further entitled to any and all relief permitted under 42 U.S.C. § 12117(a), including equitable relief.

## COUNT VI

Equal Pay Act - 29 U.S.C. §206(d)

70.     Plaintiff realleges and incorporates herein by reference the foregoing paragraphs.

71.     Plaintiff's total compensation was less than Mr. Ketchum's total compensation and Mr. Gungee's total compensation for equal work on jobs requiring equal skill, effort, and responsibility which were performed under similar working conditions.

72.     Plaintiff's CEO duties were identical to the CEO duties of Mr. Ketchum and Mr. Gungee.

73.     Plaintiff's total compensation was less than Mr. Ketchum's total compensation and Mr. Gungee's total compensation.

74.     Plaintiff, Mr. Ketchum and Mr. Gungee worked in the same office under similar working conditions and completed the same role.

75.     Plaintiff, Mr. Ketchum, and Mr. Gungee performed equal work that required similar skill, effort, and responsibility.

76.     Plaintiff was terminated on or about January 19, 2024.

77.     As a direct and proximate result of the foregoing violations of the EPA, Plaintiff has sustained economic and non-economic damages, including, but not limited to, denial of the wages and other benefits, lost interest on those wages and other benefits, and loss of the opportunity to advance within PMHS. Plaintiff is entitled to recover economic and statutory damages and penalties, including back pay, front pay, liquidated damages, and other appropriate relief.

### Count VII

Americans with Disabilities Act 42 U.S.C. §12203(a)
Hostile Work Environment – Disability

78.     Plaintiff realleges and incorporates herein by reference the foregoing paragraphs.

79.     Plaintiff was a qualified individual with a disability because Graves' disease (hyperthyroidism) impacted Plaintiff's major life activity by limiting her ability to sleep, speak, walk, think and concentrate.

80.     Plaintiff suffered unwelcome harassment throughout her employment with PMHS.

81.     The harassment was based on Plaintiff's disabilities.

82.     The harassment was sufficiently severe or pervasive to alter the conditions of Plaintiff's employment and to create an abusive working environment.

83.     PMHS knew or should have known of the harassment and failed to take prompt remedial action.

84.     As a direct and proximate result of the foregoing violations, Plaintiff has sustained economic and non-economic damages, including, but not limited to, denial of the wages and other benefits, lost interest on those wages and other benefits, and loss of the opportunity to advance within PMHS. Plaintiff is entitled to recover economic and statutory damages and penalties, including back pay, front pay, liquidated damages, and other appropriate relief.

## Count VIII

Missouri Whistleblower's Protection Act (WPA), Mo. Rev. Stat. § 285.575.5
Retaliation

85.     Plaintiff incorporates by reference all previous paragraphs.

86.     Plaintiff is an employee under Mo. Rev. Stat. § 285.575.

87.     PMHS is an employer under Mo. Rev. Stat. § 285.575.

88.     Plaintiff is a protected person under Mo. Rev. Stat. § 285.575.

89.     PMHS illegally discharged Plaintiff after she reported potential Medicaid billing fraud to the Missouri Attorney General's Office's Medicaid Fraud Control Unit first in September 2023 and again in December 2023.

90.     Fraudulent billing is a violation of public policy as articulated in Missouri law, and ignoring such action would also be a violation of the law.

91.     Plaintiff's reporting of potential Medicaid billing fraud to the Missouri Attorney General's Office's Medicaid Fraud Control Unit was the motivating factor in her discharge from PMHS.

92.     As a direct and proximate result of the foregoing violations, Plaintiff has sustained economic and non-economic damages, including, but not limited to, denial of the wages and other

benefits, lost interest on those wages and other benefits, and loss of the opportunity to advance within PMHS. Plaintiff is entitled to recover economic and statutory damages and penalties, including back pay, front pay, liquidated damages, and other appropriate relief.

## Count IX

41 U.S.C. § 4712 - Enhancement of contractor protection from reprisal for disclosure of certain information
Retaliation

93.     Plaintiff realleges and incorporates herein by reference the foregoing paragraphs.

94.     Pursuant to 41 U.S.C. § 4712(a)(1), "[a]n employee of a … grantee, or subgrantee … may not be discharged, demoted or otherwise discriminated against as a reprisal for disclosing to a person or body described in paragraph (2) information that the employee reasonably believes is evidence of gross mismanagement of a Federal contract or grant…." 41 U.S.C. § 4712(a)(1).

95.     PMHS is a "grantee" as defined under 41 U.S.C. § 4712(a)(1).

96.     Plaintiff was an "employee" of PMHS   under § 4712(a)(1).

97.     Plaintiff "disclose[d] . . . information that [she] reasonably believe[d] [was] evidence of gross mismanagement of a Federal contract or grant, a gross waste of Federal funds, an abuse of authority relating to a Federal contract or grant, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a Federal contract (including the competition for or negotiation of a contract) or grant."  41 U.S.C. § 4712(a)(1).

98.     Plaintiff engaged in protected activity by reporting alleged gross mismanagement of PMHS' USDA grant compliance to PMHS, Mr. Crawford and Ms. Green at various times during November 2023.

99.     PMHS knew Plaintiff engaged in protected activity.

22

100.    PMHS retaliated against Plaintiff by terminating her employment on or about January 19, 2023.

101.    PMHS' retaliation was motivated by Plaintiff's protected activity because her conduct was in furtherance to stop one or more violations of 41 U.S.C. § 4712(a)(1).

102.    Plaintiff began her protected activity when she became aware of the potential USDA grant violations in November 2023, and continued to oppose PMHS's potentially grant compliance violations until her termination on or about January 19, 2024.

103.    Plaintiff's termination can reasonably be presumed to have been caused by protected activity that began in November 2023, and continued throughout her active tenure as CEO through about January 19, 2023

104.    As a direct and proximate result of the foregoing violations of 41 U.S.C. § 4712, Plaintiff has sustained economic and non-economic damages, including, but not limited to, denial of the wages and other benefits, lost interest on those wages and other benefits, and loss of the opportunity to advance within PMHS. Plaintiff is entitled to recover economic and statutory damages and penalties, including back pay, front pay, liquidated damages, and other appropriate relief.

## Count X

### Anticipatory Breach

105.    Plaintiff realleges and incorporates herein by reference the foregoing paragraphs.

106.    The Agreement is valid and enforceable.

107.    Plaintiff has the qualifications to fulfill the terms of the Agreement.

108.     PMHS clearly and positively indicated, by words or conduct, that PMHS would not or could not meet the Agreement's requirement to pay Plaintiff through August 31, 2026.

109.    PMHS, therefore, has breached the Agreement.

110.    Because PMHS has unequivocally declared the intent not to perform as required by the Agreement, Plaintiff can sue immediately for the breach of contract.

## Count XI

Wrongful Termination in Violation of Public Policy

111.    Plaintiff realleges and incorporates herein by reference the foregoing paragraphs.

112.    Plaintiff was discharged from employment for reasons that violate public policy because it is a violation of public policy to discharge an employee for reporting PMHS's violations of law to various state and federal agencies.

113.    From October 2023 through her termination date, Plaintiff reported PMHS' potential regulatory violations to various administrative agencies such as the DOL and USDA.

114.    Plaintiff was actively employed by PMHS.

115.    Plaintiff reporting of PMHS's various regulatory mishaps was a substantial motivating reason for PMHS's termination.

116.    As a direct and proximate result of the foregoing violations, Plaintiff has sustained economic and non-economic damages, including, but not limited to, denial of the wages and other benefits, lost interest on those wages and other benefits, and loss of the opportunity to advance within PMHS.

## Count XII

Americans with Disabilities Act 42 U.S.C. §12203(a)
Retaliation and Discrimination

117.    Plaintiff realleges and incorporates herein by reference the foregoing paragraphs.

24

118.    Plaintiff is a qualified individual within the meaning of 42 U.S.C. § 12111(8) in that she suffers from a Graves' disease (hyperthyroidism) which caused physical impairment that substantially limits Plaintiff's major life activities including sleeping, speaking, walking, thinking and concentrating.

119.    PMHS knew about Plaintiff's disability.

120.    PMHS is an "employer" within the meaning of 42 U.S.C. §§ 12111(5) in that it is engaged in an industry affecting commerce and has more than 15 employees for each working day in each of 20 or more calendar weeks in the current and preceding years. Thus, PMHS is also a covered entity within the meaning of 42 U.S.C. §12111(5).

121.    Plaintiff was an employee of PHMS within the meaning of 42 U.S.C. § 12111(4).

122.    Prior to and at the time that PMHS terminated Plaintiff's employment, Plaintiff was qualified for employment as CEO.  On or about January 12, 2024, due to Plaintiff's actual disability, PMHS terminated her employment and/or retaliated against her in violation of 42 U.S.C. § 12112(a). Specifically, PHMS's discriminatory and/or retaliatory actions included, but were not limited to (1) limiting, segregating, or classifying Plaintiff in a way that adversely affected her opportunities or status because of her actual or perceived disability within the meaning of §12112(b)(1); (2) utilizing standards, criteria, or methods of administration that have the effect of discrimination on the basis of disability within the meaning of §12112(b)(3)(A); (3) not making reasonable accommodations for the known limitations of Plaintiff – an otherwise qualified individual – despite the fact that doing so would not impose an undue hardship on the operation of Defendant's business within the meaning of § 12112(b)(5)(A); (4) denying employment opportunities to Plaintiff based on Plaintiff's need to make reasonable accommodations for her

25

mental impairments within the meaning of §12112(b)(5)(A); and (5) using qualification standards, employment tests, or other selection criteria that screened out or tended to screen out individuals with disabilities, despite the fact that doing so was not consistent with business necessity, within the meaning of § 12112(b)(6).

123.    Plaintiff has been damaged by PMHS's violation of the ADA inasmuch as Plaintiff has been unable to use her education and training as CEO, and has suffered loss of past and future wages and benefits, loss of professional opportunities, emotional distress, and mental pain and anguish.

125.   Plaintiff is entitled to her attorneys' fees and costs incurred in this matter pursuant to 42 U.S.C. § 12205.  Plaintiff is further to any and all relief permitted under the ADA, 42 U.S.C. § 12117(a), including equitable relief.

<u>JURY TRIAL DEMAND</u>

Plaintiff requests a jury trial on all questions of fact raised by this Complaint.

<u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiff prays for the following:

1)    Summons issue for PMHS and Pemiscot County;

2)    Trial by Jury;

3)    An award of economic, non-economic, compensatory and punitive damages to Plaintiff in an amount to be determined at trial, together with post-judgement and pre-judgment interest, costs, and attorneys' fees;

4) An order that PMHS and Pemiscot County reinstate Plaintiff in part-time or full-time employment, at her option, with any necessary reasonable accommodation, for which she is qualified, at the average rate she would have earned had her conditional or contingent offer not been rescinded or her employment with PMHS had not terminated, with retroactive seniority, payment of back pay with interest, pension, and related benefits;

5) An order enjoining  PMHS and Pemiscot County from failing or refusing to provide sufficient remedial relief to make whole Plaintiff for the losses she has suffered as a result of the adverse treatment presented in this Complaint;

6) An order requiring PMHS and Pemiscot County to take other appropriate nondiscriminatory measures to overcome the effects of the discrimination; and,

7) Such other relief as the Court deems just and proper.

Respectfully submitted this 14th day of September, 2024.

*/s/ Danel A. Dufresne*
Danel A. Dufresne (MN - 0319065)
Attorney for Plaintiff
Dufresne Law Firm, PLLC
21 Cooper Circle
Edina, MN 55436
Telephone: (858) 740-8181
Email: daneldufresne@gmail.com

27